THOMAS CAIN, APPELLANT, V. ANN DOWLING ET AL., APPELLEES.

FILED MARCH 11, 1921.   No. 21367.

Specific Performance: ADOPTION: PAROL CONTRACT. In an action for specific performance of an oral agreement alleged to have been made with a deceased person to adopt a child and make him an heir, the contract must be proved by evidence that is clear, convincing and satisfactory, and the party seeking to enforce it must show such performance on his part that a failure to enforce it would be a fraud upon his rights.

APPEAL from the district court for Knox county: ANSON A. WELCH, JUDGE. Affirmed.

Baker & Ready and Barnhart & Stewart, for appellant.

M. F. Harrington and J. F. Green, contra.

MORRISSEY, C. J.

Plaintiff prayed for specific performance of an oral contract alleged to have been entered into between Daniel Dowling, now deceased, and James Cain, father of plaintiff, in 1891. It is alleged that it was agreed between plaintiff's father and Dowling that plaintiff, then about ten years of age, should be surrendered by his father, his only surviving parent, to Dowling, and that Dowling then and there agreed that, in consideration of the services, society and companionship of the boy, Dowling agreed to adopt plaintiff as a son, and that, upon Dowling's death, he would leave to plaintiff a share of his estate equal to a child's share therein; that he would treat him as a son, pro-

vide for his wants, educate and care for him. From a finding and judgment in favor of defendants, who are the widow and adopted daughter of Dowling, plaintiff appeals.

Plaintiff's mother was a sister of Daniel Dowling. She died in February, 1891, leaving seven children, viz.: Mary, James, Thomas, Will, Frank, Celestine, and a newly born babe, in destitute circumstances. The newly born babe was taken to Mr. Dowling's home to be cared for before the death of its mother, and a few days after her death Thomas, Will, Frank and Celestine were also received into the home. Some time later in the same year James also found a home with his uncle. The baby died within a few months, while the other boys grew to manhood. A short time after Thomas, Will, Frank and Celestine had been received into their uncle's home, their father, who appears to have been a shiftless character, went there, as he says, for the purpose of bidding them good-bye, as he intended to go to South Dakota. He testified that when he was preparing to leave the Dowling home:

"I took the little baby and kissed him, and got in my buggy and wanted to bid them all good-bye, and I said: 'Good-bye, Tommy.' Tommy was off a short distance from uncle, and about the same distance from me, and I said 'Good-bye, Tommy,' and reached out my hand to him, and, instead of coming to me, Tommy walked up to uncle. He didn't go right up close to him; then I took the bold way that I used to have of talking cross, and I said 'Come here, Tommy, and bid me good-bye,' and he sided up closer to uncle. Then uncle said to Tommy to go and bid me good-bye, and Tommy came up then and bid me good-bye. Just as Tommy was turning away uncle said, said he, 'Jim,' they called me Jim; he said, 'Give me Tommy.' He says, 'I'll do as well by him as I will for Annie,' and I stopped a minute, and then I said, 'Well, you can have Tommy.' * * * He said whatever he done he would do just as well for him as Annie. Well, he did say 'I will raise Tommy well, and I will do as well for him as I will for Annie.'"

. He then drove away and never again exercised any control over the boy. Plaintiff testified:

"We weren't quite to the barn, close to the barn, and he said that he came down to bid the children good-bye, so. they all shook hands with him, and I wouldn't shake hands with him. I was standing close to uncle, and I walked on over close to the corner of the barn where uncle was and stood close to him, and father reached out his hand and wanted to know if I wasn't going to shake hands with him, and I didn't say, and uncle told me to go and shake hands with him, and I did, and walked right back to uncle, and uncle says to father, 'Give me Tom,' and father stopped for a few minutes, and then said, 'All right, you may have Tom,' and uncle and I went up to the house.    *   *   *   He said he would take me and raise me and give me an education and I should share in his property equal with Annie, *   *   *   when he died."

Plaintiff also testified that some time subsequent to the conversation just related, a friend of his uncle was visiting at the home, and Mr. Dowling put his hand upon plaintiff's shoulder and said: "This is my boy." That the friend asked Mr. Dowling if the other boys were not his, and Mr. Dowling said: "They were staying there, but 'this was my boy;'" that plaintiff was then 15 or 16 years of age. Plaintiff's sister was a witness for plaintiff, and testified to a conversation had with her uncle in relation to plaintiff's inability to write a letter, and she quotes Mr. Dowling as saying, "Now, don't be too hard on Tom. I have deprived Tom of the schooling. He was the only one of the boys I could depend on to herd my cattle and take care of my stock.   *   *   *   He said he would have to do by Tom as he would by Annie when he died.   *   *   * We would talk about all the boys, and he was always mentioning Tom as his 'stay-by,' as he called him—the one he depended on." She further stated that her uncle once remarked to her that "he had a notion to adopt Tom, but he would have to have my signature, and I told him he could have my signature.   *   *   *   He would always

speak of Tom as the favorite—as 'his boy.' He had always spoken of him as 'his boy.'" It is claimed by plaintiff that he was deprived of educational advantages and kept closely at work, and that he remained with his uncle, working and assisting upon the uncle's farm and caring for the uncle's live stock, until he had reached his majority.

Defendants testified that plaintiff was in school at the time the contract is alleged to have been made, and that he did not even see his father on that occasion. They offered testimony to show that plaintiff was given the school privileges usually accorded farm boys in that neighborhood at that time. They also deny that plaintiff did more than is usually done by a boy upon a farm, and it is claimed that, in place of remaining with his uncle until he had reached the age of 21, when he was 17 or 18 years of age he and his oldest brother had a slight disagreement with their uncle and left home; that, after three or four days, plaintiff returned and then entered the employ of his uncle for wages, and that he never thereafter worked for his uncle except in the capacity of a hired man. After this incident the oldest brother returned from time to time to the Dowling home, was always cordially received, and called the place his home, but does not appear to have entered the employ of his uncle. The younger brothers continued to make their home with their uncle, and all the children since entering the Dowling household have referred to the place as home and appear to have been kindly and generously treated there. A check issued by Mr. Dowling, payable to plaintiff, and showing upon its face that it was for wages, is in the record to contradict the claim of plaintiff that he continued to serve his uncle until he reached his majority, and it corroborates the testimony of defendants that, whenever plaintiff worked for his uncle, after reaching the age of 17 or 18, he was paid wages. Plaintiff never took the name of Dowling, but, like his brothers, was known by his father's name. Aside from whatever may be gathered from the testimony set out, there is nothing to show that he was treated any differently in

the Dowling household than were his brothers. No reason is pointed out why he should be singled out as a special favorite of the uncle. He never asserted any claim to an interest in his uncle's property until after the uncle's death. No witness testified, except as hereinbefore recited, to any statement by Mr. Dowling relating to the adoption of plaintiff, or any agreement that he might have made to treat him in any different way from the way he treated his other nephews. The father drifted away, leaving not only this boy but his other boys to be cared for by Mr. and Mrs. Dowling. He did not return to his children until after the lapse of 20 years, when apparently he needed their protection and support. It is a most remarkable circumstance that it is not even claimed that Mrs. Dowling, the woman who cared for these neglected children, had any knowledge that her husband had entered into a contract of adoption. She was never called mamma by plaintiff. Her husband was never called papa by him. Annie Dowling, the adopted daughter, had no knowledge of it. The brother, James Cain, with whom plaintiff seems to be on friendly terms, corroborates the testimony of defendants in relation to plaintiff having worked for wages for his uncle after the disagreement mentioned when the two boys left home. He also corroborates their story as to the uncle having given plaintiff a team of mules when he left the uncle's place while still a minor.

Parol agreements for the adoption of children are frequently enforced, but it is uniformly held that the contract of adoption must be definite, and that substantial performance must be proved. In *Tuttle v. Winchell,* 104 Neb. 750, it is said: "The parents' sacrifice in giving up the child to those who promise to adopt it, and the subsequent society, companionship, and filial obedience of the child, constitute the consideration for a parol contract of adoption." Plaintiff's father made no sacrifice in surrendering plaintiff. On the other hand, he shifted the responsibility of caring for his minor boys to their uncle and aunt, and they furnished each child a good home until he reached man's estate.

The making of the contract is not proved with definiteness and certainty, and, if made, plaintiff has not shown such performance on his part as would justify a court of equity in decreeing its specific performance. Indeed, a preponderance of the evidence shows that, however faithful and industrious plaintiff may have been as a small boy, when he reached the age of 17 or 18 years, he absolved himself from all responsibility to his uncle and started out in the world a free agent to do for himself. The evidence sustains the judgment of the district court, and it is

AFFIRMED.